# United States Court of Appeals
### For the Eighth Circuit

_____

No. 15-2507

_____

Jassmine D. Adams

*Plaintiff - Appellee*

State of Minnesota, Department of Human Services; UCare Minnesota; Medica
Health Plans

*Intervenor Plaintiffs - Appellees*

v.

Toyota Motor Corporation; Toyota Motor Sales, U.S.A., Inc.; Toyota Motor North
America, Inc.; Toyota Motor Engineering and Manufacturing North America, Inc.;
Toyota Motor Manufacturing, Kentucky, Inc.; Calty Design Research, Inc.

*Defendants - Appellants*

_____

No. 15-2516

_____

Quincy Ray Adams

*Plaintiff - Appellee*

State of Minnesota, Department of Human Services; UCare Minnesota; Medica
Health Plans

*Intervenor Plaintiffs - Appellees*

v.

Toyota Motor Corporation; Toyota Motor Sales, U.S.A., Inc.; Toyota Motor North America, Inc.; Toyota Motor Engineering and Manufacturing North America, Inc.; Toyota Motor Manufacturing, Kentucky, Inc.; Calty Design Research, Inc.

*Defendants - Appellants*

_____

No. 15-2635

_____

Jassmine D. Adams

*Plaintiff - Appellant*

State of Minnesota, Department of Human Services; UCare Minnesota; Medica Health Plans

*Intervenor Plaintiffs*

v.

Toyota Motor Corporation; Toyota Motor Sales, U.S.A., Inc.; Toyota Motor North America, Inc.; Toyota Motor Engineering and Manufacturing North America, Inc.; Toyota Motor Manufacturing, Kentucky, Inc.; Calty Design Research, Inc.

*Defendants - Appellees*

_____

No. 15-2636

_____

Bridgette Trice, as trustee for the heirs and next of kin of Devyn Bolton, deceased

*Plaintiff - Appellant*

Koua Fong Lee; Nhia Koua Lee; Nong Lee; Panghoua Moua; Jemee Lee, a minor child; American Family Mutual Insurance Company, as subrogee of Koua Fong Lee; State of Minnesota, Department of Human Services; UCare Minnesota;

Medica Health Plans

*Intervenor Plaintiff*s

v.

Toyota Motor Corporation; Toyota Motor Sales, U.S.A., Inc.; Toyota Motor North America, Inc.; Toyota Motor Engineering and Manufacturing North America, Inc.; Toyota Motor Manufacturing, Kentucky, Inc.; Calty Design Research, Inc.

*Defendants - Appellees*

_____

No. 15-2637

_____

Bridgette Trice, as trustee for the heirs and next of kin of Devyn Bolton, deceased

*Plaintiff*

Koua Fong Lee; Nhia Koua Lee; Nong Lee; Panghoua Moua; Jemee Lee, a minor child

*Intervenor Plaintiffs - Appellants*

American Family Mutual Insurance Company, as subrogee of Koua Fong Lee; State of Minnesota, Department of Human Services; UCare Minnesota; Medica Health Plans

*Intervenor Plaintiff*s

v.

Toyota Motor Corporation; Toyota Motor Sales, U.S.A., Inc.; Toyota Motor North America, Inc.; Toyota Motor Engineering and Manufacturing North America, Inc.; Toyota Motor Manufacturing, Kentucky, Inc.; Calty Design Research, Inc.

*Defendants - Appellees*

_____

No. 15-2638
_____

Quincy Ray Adams

*Plaintiff - Appellant*

State of Minnesota, Department of Human Services; UCare Minnesota; Medica
Health Plans

*Intervenor Plaintiff*s

v.

Toyota Motor Corporation; Toyota Motor Sales, U.S.A., Inc.; Toyota Motor North
America, Inc.; Toyota Motor Engineering and Manufacturing North America, Inc.;
Toyota Motor Manufacturing, Kentucky, Inc.; Calty Design Research, Inc.

*Defendants - Appellees*
_____

Appeals from United States District Court
for the District of Minnesota - Minneapolis
_____

Submitted: August 1, 2017
Filed: August 11, 2017
_____

Before LOKEN, MURPHY, and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

On June 10, 2006, Koua Fong Lee was driving his 1996 Toyota Camry on the
interstate. When Lee exited the interstate, the Camry failed to come to a stop and

rear-ended another car waiting at a stoplight, killing three of the other car's five passengers and injuring others, including those in Lee's vehicle. Lee was convicted of vehicular homicide, but his conviction was vacated after Toyota recalled several models of their Camry for issues related to unintended acceleration, ultimately leading to new evidence in Lee's case.

Family members of the deceased filed a lawsuit against Toyota in state court in 2010, alleging, among other things, personal injury and wrongful death based on strict product liability, and Lee eventually joined as a plaintiff. Following a four-week trial, a jury found Lee 40 percent and Toyota 60 percent at fault for the collision. The district court entered judgment on June 25, 2015. Having jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part.

## I. Background

In June 2006, after attending several family events in Minneapolis, Lee was driving his 1996 Toyota Camry eastbound on the interstate from Minneapolis toward St. Paul with his pregnant wife, their young daughter, his father, and his brother. He was going around 65 miles per hour. He exited the interstate at the Snelling Avenue ramp, which had a slight incline leading up to an intersection. Lee testified that he pressed on the accelerator as he went up the ramp and pushed on the brake at the top of the incline, approximately 600 feet from the intersection.

Lee and his passengers explained that as Lee approached the intersection, he pumped the brakes and yelled that they were not working. The Camry was going approximately 75 miles per hour when it rear-ended an Oldsmobile Ciera that was waiting at a red light, pushing the Oldsmobile into oncoming traffic. The Oldsmobile's driver, Javis Trice-Adams, and Trice-Adams' six-year-old son, Javis Jr., died at the scene of the collision. Quincy Adams, Trice-Adams' father, was seated in the front passenger seat and suffered a traumatic brain injury. Trice-Adams'

-5-

niece, six-year-old Devyn Bolton, was seated in the middle of the back seat. Upon impact, she ceased breathing and her heart stopped beating. Paramedics revived her in the ambulance, though she stayed in a coma for a period of weeks. Devyn was rendered quadriplegic, and though she was able to fully regain her mental faculties, she died from respiratory complications arising from her quadriplegia approximately a year after the accident. Finally, Jassmine Adams, Trice-Adams' thirteen-year-old daughter, was seated in the back passenger seat of the car. Her leg was crushed by the impact, but she survived. Occupants of Lee's car were also injured, but all survived. In 2007, Lee was charged with vehicular homicide. Though he alleged at trial that the Camry's brakes were not working, he was convicted and sentenced to eight years in prison.

In 2010, Toyota recalled several models of their Camry—not including the 1996 Camry Lee was driving at the time of the accident—for issues related to unintended acceleration.[1] Lee filed a petition for post-conviction relief in state court based on new information about instances of unintended acceleration in 1995 and 1996 Camrys, and his conviction was ultimately vacated. Prosecutors did not appeal or pursue additional criminal charges, and Lee was released after being incarcerated for over two years.

Family members of the deceased filed this product liability lawsuit against Toyota in state court in 2010, alleging that a defect in Lee's Camry's acceleration system led to the collision and resultant injuries. Lee eventually joined as a plaintiff. Toyota removed the case to federal court. Prior to trial, the district court ruled on a number of motions, including Toyota's motion to exclude evidence of other similar instances of unintended acceleration (OSIs) and Toyota's motion to exclude the

---

[1]Because Lee's 1996 Camry was not included in the recall, the jury was instructed not to consider the recalls for any purpose.

testimony of the plaintiffs' mechanical engineering expert, John Stilson.[2]  The court allowed the plaintiffs to present OSI evidence, but required the plaintiffs to reduce their proposed witnesses to "a list of a much smaller number . . . whose testimony is most similar," ultimately limiting the plaintiffs to three OSI witnesses.  Each OSI witness testified that he was driving a 1996 Toyota Camry with over 100,000 miles on it when he experienced at least one incident of unintended acceleration.

The court denied the motion to exclude the plaintiffs' expert.  At trial, the plaintiffs' expert, Stilson, explained the relevant parts of a 1996 Camry's engine, focusing specifically on the components of the accelerator control system—which included the throttle—and the cruise control system.  Though both systems were housed within the same plastic dust cover, Stilson testified that the cruise control system was mechanically separate from the accelerator control system.  Stilson opined that the accelerator control system was defective.  He conducted testing which revealed that, when heated to a certain temperature, two of the throttle pulleys in the accelerator control system would bind together and cause the throttle to stick.  In order to conduct these tests, he explained, he had to clip the cruise control arm away from its original factory position.  Stilson ultimately concluded that the plastic dust cover had gaps allowing heat to enter and become trapped inside, causing the plastic throttle pulleys to overheat and stick together.  In Stilson's opinion, this sticking defect led to the unintended acceleration, and ultimately to the collision in this case.

Prior to the verdict, Toyota moved for judgment as a matter of law (JAML), arguing that the evidence was insufficient to prove a design defect and causation.  Toyota also reiterated its arguments about the inadmissibility of the OSI evidence and Stilson's testimony in post-trial motions, which the district court denied.  The jury returned a $14 million verdict in favor of the plaintiffs, though the court reduced the

---

[2]The district court also granted partial summary judgment for Toyota on several issues, none of which is challenged in this appeal.

monetary award to plaintiff Bridgette Trice, Devyn Bolton's mother, based on a prior settlement. Judgment was entered in June 2015. Toyota timely appealed and Trice cross-appealed.

On appeal, Toyota argues that the district court erred in (1) admitting the OSI evidence, (2) admitting Stilson's expert testimony, (3) denying Toyota's motion for JAML, and (4) awarding plaintiff Trice prejudgment interest. On cross-appeal, Trice argues that the district court erred in reducing her monetary award.

## II. Discussion

### A.    OSI Evidence

Toyota argues that the district court erred by allowing the plaintiffs to present evidence of allegedly similar incidents experienced by other 1996 Toyota Camry drivers. "The decision whether to admit 'similar-incident' evidence is committed to the sound discretion of the district court," Arabian Agri. Servs. Co. v. Chief Indus., Inc., 309 F.3d 479, 485 (8th Cir. 2002), and we will not overturn the decision to admit OSI evidence absent a clear and prejudicial abuse of discretion, see First Sec. Bank v. Union Pac. R.R. Co., 152 F.3d 877, 879 (8th Cir. 1998); Drabik v. Stanley-Bostitch, Inc., 997 F.2d 496, 508 (8th Cir. 1993).

OSI evidence "may be relevant to prove the defendant's notice of defects, the defendant's ability to correct known defects, the magnitude of the danger, the product's lack of safety for intended uses, or causation." Lovett ex rel. Lovett v. Union Pac. R.R. Co., 201 F.3d 1074, 1081 (8th Cir. 2000); see Fed. R. Evid. 401 (evidence must be relevant).[3]  "Evidence of prior accidents is admissible only if the

_____

[3]The district court instructed the jury that it could consider the OSI evidence only to determine whether there was an unreasonably dangerous defect in Lee's 1996 Camry.

proponent of the evidence shows that the accidents occurred under circumstances substantially similar to those at issue in the case at bar." Hale v. Firestone Tire & Rubber Co., 756 F.2d 1322, 1332 (8th Cir. 1985). An OSI need not "occur in precisely the same manner in order to qualify as being substantially similar." Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 554 (D.C. Cir. 1993).

The district court permitted three witnesses to testify about purportedly similar incidents: Michael Frazier, Ronald Neumeister, and Patrick Powers. Michael Frazier testified that his family purchased a 1996 Camry in 1998. In September 2006, after his daughter reported a problem with the car, Frazier attempted to drive the Camry from Boston to Rhode Island—approximately 75 miles. Frazier explained that he drove the Camry through a tunnel in stop-and-go traffic with little need to use the accelerator; releasing his foot from the brake pedal was enough to let the car crawl forward. At one point when Frazier removed his foot from the brake pedal, the Camry lurched forward. Frazier testified that he tapped the gas pedal and the car returned to normal. The car lurched again 30 seconds later. Frazier again tapped the accelerator, keeping his left foot on the brake pedal, but the racing "got worse" each time, meaning the engine revved "even more." Frazier put the car in neutral and turned off the engine in an attempt to gain control of the car, but the engine continued racing when he reignited it. Frazier had both feet on the brake pedal and used the full weight of his body to control the car with the brakes. When he was able to exit the tunnel and get to the side of the road, the Camry had caught fire. A mechanic told Frazier the cause of the revving was a "sticky valve." The Camry had approximately 135,000 miles on it at the time of this incident.

Ronald Neumeister testified that his family purchased a 1996 Camry in 1998 and drove it without incident until 2006. Then, Neumeister described an incident where he applied pressure to the gas pedal to accelerate up a highway on-ramp until he reached a speed of approximately 60 miles per hour. When Neumeister released his foot from the accelerator, the Camry continued accelerating. Neumeister testified

that he immediately checked to see if something had jammed the gas pedal, but found nothing unusual.  Neumeister put the car in neutral and steered it to the side of the highway.  After inspecting the car, Neumeister turned it back on and drove home.  The Camry had over 100,000 miles on it at the time of this incident.  Neumeister also testified that on several other occasions, the engine would accelerate immediately upon his starting the Camry, and that he experienced one other incident of unintended acceleration after applying pressure to the gas pedal while driving.

Dr. Patrick Powers testified that he purchased a used 1996 Camry in 2000 or 2001.  The Camry had approximately 160,000 miles on it when Powers purchased it.  In 2008, Powers accelerated onto the freeway and then took his foot off the gas pedal, but the Camry continued accelerating.  Thinking the gas pedal may be stuck, Powers tapped it with his foot.  However, tapping the gas pedal caused the car to continue to "accelerate wide open," "as if the gas was floored."  The brakes did not respond to normal pressure, and only responded slightly when Powers put both feet on the brake and applied the full weight of his body, which caused the car to smoke.  Powers testified that his car accelerated to a speed of at least 95 miles per hour, with a maximum speed of perhaps 120 miles per hour.  Powers attempted to put the car in neutral several times before he was successful.  When Powers put the Camry in neutral the final time, he was able to regain control of the vehicle, coast to the side of the road, and turn the car off.  After exiting the highway, Powers experienced several instances where the accelerator stuck at a particular speed, but did not accelerate independently.  He testified on redirect examination that the brakes "had no measurable effect whatsoever" in the first two miles of the highway incident.

On cross examination, Toyota elicited testimony from both Powers and Neumeister that the acceleration problem did not reappear after a mechanic cleaned the throttle body on each of their Camrys.  However, the testimony of Frazier, Powers, and Neumeister established that these men and their mechanics were largely unable to identify the cause of the unintended acceleration.

-10-

Toyota argues that the plaintiffs failed to establish that the OSIs were caused by the same defect alleged in this case, and that the district court therefore abused its discretion in admitting the OSI evidence for the purpose of proving a defect. Toyota concedes that our court "has not held that proponents must show that the other-incidents were caused by the same or similar defect," but argues that our "cases foreshadow that conclusion." Our case law is well-established: Similar incident evidence is admissible only if the incidents "occurred under circumstances substantially similar to those at issue in the case at bar." Hale, 756 F.2d at 1332. But "[t]here are no hard or fast rules as to what degree of similarity there must be to make the evidence admissible." Henwood v. Chaney, 156 F.2d 392, 397 (8th Cir. 1946). Rather, in determining the admissibility of OSI evidence, the appropriate focus is on all of the "circumstances" surrounding the OSI evidence, not necessarily any specific similarity. See Torbit v. Ryder, 416 F.3d 898, 903 (8th Cir. 2005); Hale, 756 F.2d at 1332; see also U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd., 582 F.3d 1131, 1147–48 (10th Cir. 2009).

We have, for example, found an abuse of discretion in allowing similar incident evidence when the facts showed that "the circumstances of the accidents differ[ed]." Hale, 756 F.2d at 1332 (district court improperly allowed evidence of prior accidents involving "explosive separation of RH5° rims, with no restriction as to the circumstances or the dates of the accidents"). Conversely, we have found no abuse of discretion in allowing OSI evidence when the district court concluded that the prior incidents "occurred under circumstances substantially similar to those" at issue in the case. Arabian Agric. Servs. Co., 309 F.3d at 485 (no abuse of discretion in allowing evidence of other collapsing silos; even if the court erred in refusing to give a limiting instruction regarding the OSI silos, there was no evidence of prejudice where the defendant was "afforded the opportunity to examine and cross-examine witnesses extensively regarding the" OSIs); see also Ahlberg v. Chrysler Corp., 481 F.3d 630, 637 (8th Cir. 2007) (district court did not abuse its discretion in excluding evidence of a prior accident unless it involved "(1) a Jeep or Dodge truck with an automatic

transmission manufactured [in a similar time frame], (2) with a key left in the ignition, and (3) a child under age four"); Lewy v. Remington Arms Co., 836 F.2d 1104, 1107–09 (8th Cir. 1988) (OSI evidence involving same-model firearms admissible, but incidents involving a different model were not admissible). The inquiry into whether other incident evidence occurred under similar circumstances to those in the case at hand is case-specific, and no one factor is dispositive.

Here, the evidence showed that the circumstances surrounding each OSI and the incident in this case were similar in several respects. Each OSI witness testified that he drove a 1996 Camry with over 100,000 miles—just like Lee. Each witness testified that his Camry either accelerated or maintained its speed when he removed his foot from the gas pedal on at least one occasion—just like Lee. Each witness testified that the brakes were either ineffective or were very little help in reducing the Camrys' speed—just like Lee. Each witness testified that the problem occurred spontaneously and unpredictably, and that he was unable to regain control of the Camry within 600 feet of first experiencing the acceleration—just like Lee. The plaintiffs' expert, Dr. Stilson, reviewed the OSI evidence prior to trial, and was present for the testimony of both Neumeister and Frazier. He testified that he considered Frazier's and Neumeister's experiences to be similar to Lee's. See Torbit, 416 F.3d at 903.

We also note the careful attention the district court gave the OSI evidence, addressing Toyota's argument regarding the exclusion of this testimony on at least three separate occasions. The court demonstrated a keen awareness of the potential dangers of admitting such evidence, explaining that it did not want the OSI evidence to "obscure from the liability case of the plaintiffs," or "overcome the jury's focus," and that "jury confusion is an issue that [the court] wants to make sure [it] always has in mind." The district court was in the best position to determine whether this evidence would be unduly distracting to the jurors in this case, see Olson v. Ford Motor Co., 481 F.3d 619, 623 (8th Cir. 2007), and it exercised cautious discretion in

-12-

limiting the number of OSI witnesses to three. We decline to require a series of mini-trials on the causation of OSI evidence in order for the evidence to be admissible when, as here, the record demonstrates that the circumstances surrounding these OSIs were substantially similar to the incident at issue. Instead, in this case, questions as to the precise cause of the OSIs go toward the weight to be assigned the OSI evidence, not its admissibility. See Ahlberg, 481 F.3d at 637; Kehm v. Procter & Gamble Mfg. Co., 724 F.2d 613, 625–26 (8th Cir. 1983). A party is free to "argue to the jury that the evidence is not persuasive by pointing out dissimilarities" in the OSI evidence. Lewy, 836 F.2d at 1108; see also Joy, 999 F.2d at 554–55 (finding no abuse of discretion in admitting OSI evidence, even where "difference in the mode of failure weighs against" finding substantial similarity, where there are sufficient shared circumstances and when the evidence was offered to rebut defense theory).

We remain mindful that admitting similar-incident evidence carries the risk of raising "extraneous controversial points, lead[ing] to a confusion of the issues, and present[ing] undue prejudice disproportionate to its usefulness." First Sec. Bank, 152 F.3d at 879–80 (quoting Drabik, 997 F.2d at 508). In this case, the district court took those concerns into consideration before admitting evidence of a limited number of substantially similar incidents. In so doing, the district court did not abuse its discretion.

## B.    Expert Testimony of Stilson

Toyota also argues that the district court erred in allowing the testimony of the plaintiffs' expert, John Stilson. "We review a district court's decision concerning the admission of expert testimony for an abuse of discretion." Miller v. Baker Implement Co., 439 F.3d 407, 412 (8th Cir. 2006); see Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141–43 (1997).

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. "The inquiry envisioned by Rule 702 is . . . a flexible one. Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." Daubert v. Merrell Dow Pharma., Inc., 509 U.S. 579, 594–95 (1993) (footnote omitted). The party calling an expert must demonstrate the reliability of the expert's opinion by a preponderance of the evidence. Id. at 592 n.10. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning properly can be applied to the facts in issue." Id. at 592–93. "[W]here [an expert's] factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149 (1999) (quoting Daubert, 509 U.S. at 592). In determining whether expert testimony is admissible, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 594–95.

Stilson is a mechanical engineer and an independent automotive safety consultant with prior experience working as a product design engineer for Chrysler Corporation and Ford Motor Company. Toyota does not dispute that Stilson is qualified as an expert by "knowledge, skill, experience, training, or education" in the area of automotive engineering. Fed. R. Evid. 702. As a qualified expert, Stilson was permitted to offer an opinion provided it was based on "sufficient facts or data," and was the "product of reliable principles and methods." Id. In assessing the reliability of an expert opinion, the court may consider, among other things, whether a given theory or technique has been tested or subjected to peer review and whether a "technique enjoys 'general acceptance' within a 'relevant scientific community.'" Kumho Tire Co., 526 U.S. at 149–50 (quoting Daubert, 509 U.S. at 592–94). Toyota argues that the district court abused its discretion in admitting Stilson's opinions

-14-

under Rule 702 because his testing does not support his theory of defect and because he relied on insufficient evidence in concluding that the alleged defect caused the accident.  We disagree.

First, Toyota argues that Stilson's opinions should have been excluded because his testing methodology was faulty and did not analytically support his hypothesis. Stilson testified that he followed protocol and utilized methodology that Toyota itself recommended for testing the heat capacity of the component parts of its 1996 Camry. Cf. Presley v. Lakewood Eng'g & Mfg. Co., 553 F.3d 638, 645–46 (8th Cir. 2009) (expert opinion inadmissible when proposed expert conducted no tests and did not reliably apply relevant standards in the field).  Though the parties dispute the significance of Stilson's repositioning the cruise control arm during his thermal testing, Stilson thoroughly explained how he modified the cruise control system and why he did so.  He testified that, in his opinion as an engineer, the modification did not affect the validity of the thermal testing because the cruise control system operated independently of the throttle mechanism that was the subject of his testing. He explained that his testing supported the conclusion that the throttle pulleys fused together when subjected to high temperatures.  See Shuck v. CNH Am., LLC, 498 F.3d 868, 875 n.3 (8th Cir. 2007) (concluding that "testing, if performed, must be appropriate in the circumstances and must actually prove what the experts claim it proves" (discussing Fireman's Fund Ins. Co. v. Canon U.S.A., Inc., 394 F.3d 1054 (8th Cir. 2005))).  To the extent that repositioning the cruise control lever affected Stilson's testing, he was subject to cross-examination about the significance of this modification.  See Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence.")

Toyota also takes issue with Stilson's conclusion that the cause of Lee's accident was the thermal-induced sticking defect in the accelerator control system. Stilson explained that his testing revealed a stuck throttle at a temperature of between

160 and 165 degrees Fahrenheit.[4] Stilson testified that the plastic dust cover encasing the throttle acted like a "sauna," trapping heat generated from both inside and outside the dust cover. He opined that the dust cover had "gaps" through which heat could enter, but, because the cover was closed on the top, the heat could not easily escape. Stilson also noted that the accelerator control system, housed in the dust cover, was approximately seven inches away from the exhaust manifold—a part of the engine that reached 900 or 1000 degrees Fahrenheit—and that some of this heat would transfer into the dust cover. Finally, Stilson testified that he was able to rule out pedal misapplication as the cause of the accident, based in part on Lee's account of the incident and in part on mechanical evidence retrieved from Lee's Camry.

"[T]he district court must . . . function as a gatekeeper who 'separates expert opinion evidence based on good grounds from subjective speculation that masquerades as scientific knowledge.'" Presley, 553 F.3d at 643 (quoting Glastetter v. Novartis Pharm. Corp., 252 F.3d 986, 989 (8th Cir. 2001)). However, Stilson's opinion as to causation need not be a "scientific absolute in order to be admissible." Bonner v. ISP Tech., Inc., 259 F.3d 924, 929 (8th Cir. 2001). We conclude that Stilson's opinions represented more than "vague theorizing based on general principles," Pro Serv. Auto., LLC v. Lenan Corp., 469 F.3d 1210, 1216 (8th Cir. 2006), or "unsupported speculation," Daubert, 509 U.S. at 590. The district court did not abuse its broad discretion in allowing Stilson's expert opinion pursuant to Rule 702.

## C.    Motion for JAML

Next, Toyota argues that the district court erred in denying its motion for judgment as a matter of law. We review a district court's denial of a motion for

---

[4]Stilson's notes indicated that one of his tests revealed sticking at a temperature of 150 degrees Fahrenheit, but he testified at trial that sticking was observed at temperatures of 160 or 165 degrees Fahrenheit.

-16-

JAML de novo. Weisgram v. Marley Co., 169 F.3d 514, 516 (8th Cir. 1999). In so doing, we "draw all reasonable inferences in favor of [the plaintiffs] without making credibility assessments or weighing the evidence." Arabian Agric. Servs. Co., 309 F.3d at 482 (quoting Phillips v. Collings, 256 F.3d 843, 847 (8th Cir. 2001)). We will "uphold a jury verdict unless we conclude that a reasonable jury could not have found for that party." Knutson v. Ag. Processing, Inc., 394 F.3d 1047, 1050 (8th Cir. 2005).

"State law governs the substance of . . . diversity-based products liability actions." Pritchett v. Cottrell, Inc., 512 F.3d 1057, 1063 (8th Cir. 2008). To make out a cause of action for products liability based on a design defect under Minnesota law, the plaintiffs were required to prove: (1) the Camry was in a defective condition that rendered it unreasonably dangerous for its intended use; (2) the defective condition existed when the Camry left Toyota's control; and (3) the defect was the proximate cause of the plaintiffs' injuries. See Bilotta v. Kelley Co. Inc., 346 N.W.2d 616, 623 n.3 (Minn. 1984). "Proximate cause exists if the defendant's conduct, without intervening or superseding events, was a substantial factor in creating the harm." Thompson v. Hirano Tecseed Co., Ltd., 456 F.3d 805, 812 (8th Cir. 2006) (discussing Minnesota law); see Wright v. Willamette Indus., Inc., 91 F.3d 1105, 1106 (8th Cir. 1996).[5] Toyota argues that, even assuming Stilson's opinions and the OSI evidence were properly admitted, the plaintiffs failed to prove that a defect existed or that the alleged defect was the proximate cause of the accident. We disagree.

The plaintiffs presented sufficient evidence from which a jury could find that the 1996 Camry contained a design defect. A significant portion of this evidence is

---

[5]The district court instructed the jury that, in order to recover on the basis of a design defect, the plaintiffs had to prove that the "defective condition in the car was a direct cause of Plaintiffs' injuries." The court instructed the jury that a "'direct cause' is a cause that had a substantial part in bringing about the accident." Neither party challenges the district court's instruction.

discussed in detail above. For example, the plaintiffs presented Stilson's expert testimony, supported by tests he conducted pursuant to Toyota's recommended protocol for thermal testing. Cf. Fireman's Fund, 394 F.3d at 1058–59 (insufficient evidence of defect and causation when expert failed to propose a specific defect or conduct testing in accordance with industry standards); Weisgram, 169 F.3d at 521 (expert not qualified to testify to conclusions as to product failure given inexperience with the relevant products). Stilson told the jury that he concluded that the susceptibility of the throttle pulleys to heat-induced sticking constituted a defect and explained in great detail the bases for his conclusion. Additionally, the plaintiffs offered Lee's testimony and that of his wife, explaining that Lee attempted to apply the brakes to no avail and that the car continued accelerating on its own; evidence that Toyota had failed to conduct standard heat-related safety testing on the 1996 Camry's throttle mechanism; and OSI evidence.

The plaintiffs also presented evidence from which a reasonable jury could find that the throttle defect was "a substantial factor in creating the harm." Thompson, 456 F.3d at 812. Stilson described the components housed beneath the dust cover that generated heat, and explained that other parts would transmit heat to the throttle pulleys. He also noted that heat from components outside the throttle— namely the exhaust manifold and ambient heat—likely entered and got trapped under the dust cover, subjecting the pulleys to additional heat. Stilson explained that there was a "high probability" that heat would remain trapped under the dust cover for a period of time because there was little opportunity for ventilation. He opined that the pulleys overheated, stuck together, and ultimately caused the accident at issue in this case.

Toyota sought to refute the plaintiffs' theories of defect and causation through the testimony of its expert, Steven MacLean. MacLean did not dispute the fact that the relevant throttle pulleys would expand and stick if subjected to a temperature of 165 degrees Fahrenheit, or that the dust cover containing the pulleys was only seven

-18-

inches away from the 900 degree exhaust manifold. Instead, he asserted that Lee's vehicle never reached the temperature necessary to cause sticking. MacLean testified that he drove a 1995 Camry in a route simulating Lee's. During this simulation, the temperature in the test Camry never reached 165 degrees and the throttle pulleys did not bind together. MacLean opined that the accident was, therefore, not caused by the alleged defect. Toyota argued alternative theories of causation, including that the accident was caused by a dirty throttle body or by pedal misapplication—both of which the plaintiffs attempted to discredit. Toyota argues that MacLean's testimony, combined with the fact that the one test Stilson performed with the cruise control lever in the unmodified position did not result in a stuck throttle, mandates the conclusion that a reasonable jury could not have found that Lee's Camry ever got hot enough for the throttle pulleys to stick. As a result, according to Toyota, the plaintiffs failed to establish that the alleged defect caused the accident at issue here.

The jury heard testimony from two qualified experts with competing opinions regarding the cause of the accident. Both of them testified extensively about their respective theories of defect and causation and both were subjected to lengthy and detailed cross-examination. See Johnson v. Mead Johnson & Co., LLC, 754 F.3d 557, 562 (8th Cir. 2014) ("As long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset." (quoting Daubert, 509 U.S. at 596)). Though Toyota disagrees with Stilson's opinions and conclusions—including his explanation that moving the cruise control lever did not affect the validity of his testing—"questions of conflicting evidence must be left for the jury's determination," Bonner, 259 F.3d at 930 (quoting Hose v. Chi. Nw. Transp. Co., 70 F.3d 968, 974 (8th Cir. 1995)), and we will not reweigh the evidence, Arabian Agric. Servs., Co., 309 F.3d at 482 (citation omitted). The jury's verdict was not based on "sheer speculation," and instead is supported by reasonable inferences drawn from the plaintiffs' evidence. Rients v. Int'l Harvester Co., 346 N.W.2d 359, 362 (Minn. Ct. App. 1984). Viewing the evidence in the light

most favorable to the verdict and drawing all reasonable inferences in favor of that verdict, we conclude that this evidence was sufficient to allow a reasonable jury to find that the Camry's design defect was the proximate cause of this accident. See Bednar v. Bassett Furniture Mfg. Co., Inc., 147 F.3d 737, 739–40 (8th Cir. 1998) (finding sufficient evidence to withstand summary judgment on causation when plaintiff offered evidence of what level of toxin is generally harmful and expert testimony that the plaintiff was exposed to harmful level); cf. Rients, 346 N.W.2d at 362 (insufficient evidence of causation in product liability case when uncontroverted evidence established numerous other potential causes).

## D.    Award of Prejudgment Interest

Finally, Toyota argues that the district court erred in awarding prejudgment interest pursuant to Minn. Stat. Ann. § 549.09 on plaintiff Bridgette Trice's damages award. "[W]hether the district court had authority to grant prejudgment interest is a question of state law which we review de novo." Children's Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 868–69 (8th Cir. 2004) (quoting Trans. Cas. Co. v. Selective Ins. Co. of the S.E., 137 F.3d 540, 546 (8th Cir. 1998)).

Section 549.09 reads, in relevant part:

**Subdivision 1.  When owed; rate.** (a) When a judgment or award is for the recovery of money, . . . interest from the time of the verdict, award, or report until judgment is finally entered shall be computed by the court administrator or arbitrator as provided in paragraph (c) and added to the judgment or award.

(b) Except as otherwise provided by contract or allowed by law, preverdict, preaward, or prereport interest on pecuniary damages shall be computed as provided in paragraph (c) . . . except as provided herein . . . . Except as otherwise provided by contract or allowed by law, preverdict, preaward, or prereport interest shall not be awarded on the following:

-20-

(2) judgments or awards for future damages;

(c)(2) For a judgment or award over $50,000, . . . the interest rate shall be ten percent per year until paid.

Minn. Stat. Ann. § 549.09.

As an initial matter, Trice argues that the jury awarded no future damages because they were not instructed on, and Trice did not request, future damages. The record belies this argument. Though the parties agreed that certain instructions on future damages were unnecessary, the jury was nevertheless instructed that damages, including those for Devyn Bolton's next of kin, "may include past and future injury." The jury was instructed to determine "what Devyn Bolton would have provided to the claimants if she had lived" by considering "her life expectancy at the time of her death," "her likely future earning capacity and prospects of bettering herself had she lived," and, inter alia, "[t]he advice, comfort, assistance, companionship, and protection" she "would have given if she had lived." The special verdict form asked the jury to award damages to Devyn Bolton's next of kin to compensate for "loss of counsel, guidance, aid, advice, comfort, assistance, companionship, and protection Devyn Bolton would have given to her next of kin . . . had she lived." The jury was therefore instructed to consider future damages.

Furthermore, neither party disputes the district court's finding that it is impossible to determine which portion of Trice's award represents pecuniary damages subject to § 549.09 subdivision 1(c)(2)'s ten percent interest rate and which portion of the award represents future damages exempt from prejudgment interest under subdivision 1(b)(2). Because the Minnesota Supreme Court has not articulated how § 549.09 applies in such circumstances, we must try to predict "how the state's highest court would rule if faced with the same question." Marvin Lumber & Cedar Co. v. PPG Indus., 401 F.3d 901, 917–18 (8th Cir. 2005). In making this prediction, "we may consider relevant state precedent, analogous decisions, considered dicta,

-21-

scholarly works and any other reliable data." Ventura v. Titan Sports, Inc., 65 F.3d 725, 729–30 (8th Cir. 1995).

"Prejudgment interest is an element of damages awarded to provide full compensation by converting time-of-demand damages into time-of-verdict damages. It is designed to compensate the plaintiff for the loss of the use of the money owed." Simeone v. First Bank Nat'l Ass'n, 73 F.3d 184, 190–91 (8th Cir. 1996); see also Lienhard v. State, 431 N.W.2d 861, 865 (Minn. 1988). Prejudgment interest is also intended to encourage settlement. See Burniece v. Ill. Farmers Ins. Co., 398 N.W.2d 542, 544 (Minn. 1987) ("Prejudgment interest essentially serves a dual purpose: (1) to compensate the plaintiff for the loss of use of his money . . . and (2) to promote settlement."). In interpreting § 549.09, we aim to "give the statute a meaning which will carry out its dual purpose." Johnson v. Kromhout, 444 N.W.2d 569, 571 (Minn. Ct. App. 1989).

Section 549.09, subdivision 1(a), explains that prejudgment interest on pecuniary damages "shall be computed . . . as provided in paragraph (c) and added to the judgment or award" except as otherwise provided by law. Subdivision 1(b) explains which damages awards are exempt from the mandate of subdivision 1(a), specifically noting that interest "shall not be awarded" on future damages. Minn. Stat. Ann. § 549.09, subd. 1(b)(2); see Baufield v. Safelite Glass Corp., 831 F. Supp. 713, 719 (D. Minn. 1993) ("[T]he threshold issue is whether an award of prejudgment interest is proper. Minn. Stat. § 549.09, subd. 1(b)(1)–(5) sets forth specific judgments for which preverdict interest may not be awarded."). There is no inherent conflict between § 549.09 subdivision 1(a) and § 549.09 subdivision 1(b)(2). However, in this case, where we have a lump sum including some damages whose interest "shall be computed" in accordance with the statute and some damages that "shall not" be subject to interest, we cannot simultaneously give effect to both provisions. "[U]nder well-settled rules of statutory construction, the specific limitation on preaward interest in Minn. Stat. § 540.09, subd. 1(b)(4)" therefore

prevails over the more general interest provision articulated in § 549.09, subdivision 1(a), and Trice was not entitled to prejudgment interest. Garlyn, Inc. v. Auto-Owners Ins. Co., 814 N.W.2d 709, 715 (Minn. Ct. App. 2012) (citing Minn. Stat. Ann. § 645.26, subd. 1 (2010) and Matter of Ret. Benefits of Yetka, 554 N.W.2d 85, 91 (Minn. Ct. App. 1996)).

Several lower court cases support this interpretation. In Stinson v. Clark Equipment Co., 473 N.W.2d 333 (Minn. Ct. App. 1991), the Minnesota Court of Appeals addressed whether the district court erred in awarding prejudgment interest on a settlement agreement. The agreement provided for a lump sum plus costs and disbursements. Id. at 334. In determining prejudgment interest, the court noted that "the parties agreed to damages for personal injury in the amount of $240,000 without differentiating between types of damages." Id. at 336. It explained that it therefore did "not know if there are pecuniary damages, nor . . . the amount of future damages on which the statute explicitly disallows prejudgment interest." Id. The court concluded that, "[b]ecause the types of damages are unascertainable, the amount of prejudgment interest is indeterminable," and found § 549.09 was "inapplicable." Id.; see also Hagen v. State Bank of Cokato, No. C9-88-1407, 1989 WL 12432, at *2 (Minn. Ct. App. Feb. 21, 1989) (unpublished) ("As the jury verdict did not distinguish between past and future damages and the statute plainly says interest cannot be awarded for future damages, the trial court did not err in denying prejudgment interest.").

Similarly, Minnesota courts have consistently remanded to the trial court where the lower court failed to make a finding as to what portion of a lump sum award is subject to prejudgment interest. See Muehlhauser v. Erickson, 621 N.W.2d 24, 30–31 (Minn. Ct. App. 2000) (remanding where the parties agreed that district court erred in awarding interest on future damages); Johnson v. Washington Cty., 506 N.W.2d 632, 640 (Minn. Ct. App. 1993) (remanding for recalculation of interest where district court awarded interest on entire sum and did not "determine what portion of the

-23-

verdict constituted future damages"); Wirig v. Kinney Shoe Corp., 448 N.W.2d 526, 535 (Minn. Ct. App. 1989), aff'd in part, 461 N.W.2d 374 (Minn. 1990) (remanding for recalculation of interest award where trial court ordered preverdict interest on compensatory, future, and punitive damages). In this case, the district court did not fail to consider which portion of the award constituted future damages; instead, it specifically found that such a determination was impossible. As noted, neither party challenges this finding, so remanding under these circumstances would be futile.

Taking into account the plain language of § 549.09, lower state court decisions, and the purpose of the statute, see Leinhard, 431 N.W.2d at 865 (prejudgment interest is an element of damages), we predict that the Minnesota Supreme Court would conclude that prejudgment interest is not available for judgments that encompass multiple types of damages—some of which are subject to interest under § 549.09 and some of which are not—when it is impossible to differentiate between the types of damages included in the judgment. We therefore conclude that the district court erred in awarding prejudgment interest on the damages awarded to Trice by the jury and vacate the award of prejudgment interest on this amount.[6]

## E.     Reduction of plaintiff Bridgette Trice's Award

On cross-appeal, Trice argues that the district court erred in offsetting her award to account for a prior settlement she entered into with Lee and Lee's insurance provider. Whether a pro tanto settlement offset applies is a question of state law subject to de novo review. See Neb. Plastics, Inc. v. Holland Colors Ams., Inc., 408 F.3d 410, 419 (8th Cir. 2005).

---

[6]This ruling does not affect the stipulated past damages, which the parties agreed to prior to or during the trial and were added to the jury's award following the verdict.

Prior to the filing of this cause of action, while Devyn was still living, Trice signed a release agreement on behalf of Devyn as Devyn's mother and natural guardian. The agreement released Lee and his insurers,

> their officers, employees, representatives, successors, assigns and all other persons, firms and corporations from any and all liability, actions, causes of action, claims and demands . . . for any damages, for losses or injuries which heretofore have been or which hereafter may be sustained by me in consequence of the incident which occurred on or about June 10, 2006.

However, the release explained that it is "not to be construed as a waiver by or as an estoppel of any parties hereby released to prosecute a claim or cause of action against any other person, firm, or corporation for damages sustained as a result of the said accident hereinabove referred to . . . ." When parties execute a release agreement that does not result in the plaintiff being fully compensated for the harm she suffered—like the one in this case—the release generally "operates as a satisfaction pro tanto as to other tortfeasors." Johnson v. Brown, 401 N.W.2d 85, 88 (Minn. Ct. App. 1987); see also Gronquist v. Olson, 64 N.W.2d 159, 165 (Minn. 1954). Here, the district court found that Trice's release agreement with Lee and his insurers fell within this general rule, and applied a pro tanto offset to Trice's award in the amount Trice received from Lee and Lee's insurers.

Pro tanto satisfaction is based on the principle that "an injured person can have but one full satisfaction for his injuries," and cannot recover twice for the same injury. Id. However, in the instant case, there is no danger of a duplicative award because the release agreement and the jury verdict benefitted different plaintiffs. There is a "clear distinction" between a guardian representing the personal interests of a minor child and a wrongful death trustee as the personal representative of a decedent's next of kin. Steinlage ex rel. Smith v. Mayo Clinic Rochester, 435 F.3d 913, 916 (8th Cir. 2006). In executing the release agreement, Trice acted as Devyn's "mother and natural guardian." As such, she executed the agreement and received

benefits on behalf of Devyn. In contrast, as the wrongful death trustee, Trice acted and received benefits on behalf of Devyn's next of kin, and was prohibited from recovering damages on Devyn's behalf.[7] <u>See</u> Minn. Stat. Ann. § 573.02, subd. 1 (damages awarded under § 573.02 for wrongful death "shall be for the exclusive benefit of the . . . next of kin" in "the amount the jury deems fair and just in reference to the pecuniary loss resulting from the death."); <u>Steinlage</u>, 435 F.3d at 916–17 ("[U]nder current Minnesota law, only a court-appointed wrongful death trustee may maintain a wrongful death action, and the wrongful death trustee does not represent the estate of the decedent."); <u>Johnson v. Consol. Freightways, Inc.</u>, 420 N.W. 2d 608, 613 (Minn. 1988) (Section 573.02 "does not allow survival of a decedent's action, but rather creates an entirely new cause of action, the beneficiaries of which are third parties claiming pecuniary loss from the wrongdoer's act"); <u>Shumway v. Nelson</u>, 107 N.W.2d 531, 533 (Minn. 1961) (explaining that an action under § 573.02 "creates an entirely new cause of action for the purpose of compensating the next of kin who have suffered pecuniary loss by reason of the death of the decedent. It is not brought for the benefit of the decedent").

The purpose of § 573.02, subdivision 1 is to fully compensate a decedent's next of kin for their pecuniary losses. <u>See</u> <u>Gronquist</u>, 64 N.W.2d at 164 ("[I]f [the injured party] has not received full satisfaction, or that which the law considers such, he is not barred until he has received full satisfaction."). Allowing Devyn Bolton's next of kin to recover the full amount of the jury award in this case is not inequitable

---

[7]The court's instructions reflected this distinction. The court instructed the jury that it could compensate Devyn's next of kin for "damages arising from Devyn Bolton's death," by awarding an amount that would "fairly and adequately compensate [the next of kin] for the losses they suffered as a result of this death," but instructed the jury not to consider amounts for "the pain and suffering of Devyn Bolton before her death."

because Devyn recovered for her own injuries while she was living.[8] See Steinlage, 435 F.3d at 916 (8th Cir. 2006). We therefore conclude that Trice's award should not be reduced by the amount that Devyn previously recovered from Lee and Lee's insurers.

## III. Conclusion

For the reasons articulated above, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

––––––––––––––––––––––––––––

---

[8]The cases cited by Toyota examining other state wrongful death laws do not establish otherwise. See Thompson v. R.J. Reynolds Tobacco Co., 760 F.3d 913, 916 (8th Cir. 2014) (addressing Missouri law); Huff v. Fibreboard Corp., 836 F.2d 473, 476 (10th Cir. 1987) (interpreting Oklahoma statute to bar a wrongful death action when decedent would not have had a cause of action at the time of his death because the applicable statute of limitations had expired); Smith v. Brown & Williamson Tobacco Corp., 275 S.W.3d 748, 761–80 (Mo. Ct. App. 2008) (finding that a wrongful death action under Missouri statute was not barred by the decedent's "personal injury action during her lifetime for injuries resulting from the same cause of her death").